AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT



**LODGED**
CLERK, U.S. DISTRICT COURT
**01/30/2024**
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
**1/30/2024**
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ M.M. ___ DEPUTY

| | |
|---|---|
| United States of America, | |
| v. | |
| Angel Barragan Pimentel, Melvin Omar Cortez, and David Leopoldo Pimentel, | Case No. 8:24-mj-00044-DUTY |
| Defendants. | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 23, 2024, in the county of Orange in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1708 | Mail Theft |
| 18 U.S.C. § 371 | Conspiracy |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Lucas Watanabe
*Complainant's signature*

Lucas Watanabe, Postal Inspector (USPIS)
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____ January 30, 2024 _____

*Judge's signature*

City and state: _____ Santa Ana, California _____

Hon. John D. Early, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, LUCAS WATANABE, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a United States Postal Inspector with the United States Postal Inspection Service ("USPIS"), Los Angeles Division.  I have been employed by the USPIS since January 2022. I completed a 16-week basic training academy in Potomac, Maryland, which included training in mail theft, mail fraud, and financial crime investigations, among others.  I am currently assigned to the Long Beach Mail Theft and Violent Crimes Team, where I investigate violations of postal law, including mail theft, bank fraud, mail fraud, credit card fraud, and related financial crimes.  I also investigate robberies, shootings, burglaries, firearms, and other related violent crimes perpetrated against United States Postal Service ("USPS") employees.

2.   I have training and experience in and/or have spoken with law enforcement officers with many years of training and experience in the above-mentioned crimes.

## II.  PURPOSE OF AFFIDAVIT

3.   This affidavit is made in support of a criminal complaint against, and arrest warrants for, ANGEL BARRAGAN PIMENTEL ("BARRAGAN"), MELVIN OMAR CORTEZ ("CORTEZ"), and DAVID LEOPOLDO PIMENTEL ("PIMENTEL"), for Conspiracy to Commit Mail Theft, in violation of 18 U.S.C. § 1708 (Mail Theft) and 18 U.S.C. § 371 (Conspiracy).  This affidavit is also made in

1

support of a search warrant for: (a) one blue iPhone with a
broken back and cracked screen, with an unknown serial number,
believed to belong to PIMENTEL ("SUBJECT DEVICE 1"); (b) one
light blue iPhone 14 with a black case believed to belong to
CORTEZ ("SUBJECT DEVICE 2"); and (c) one dark blue iPhone, with
an unknown serial number, believed to belong to BARRAGAN
("SUBJECT DEVICE 3") (collectively referred to as the "SUBJECT
DEVICES"), described in Attachment A, for the items to be seized
described in Attachment B.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
warrant and does not purport to set forth all of my knowledge
of, or investigation into, this matter.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and in part only.

### III.  <u>PROPERTY TO BE SEARCHED</u>

5.    The property to be searched are the SUBJECT DEVICES
described in Attachment A, which is incorporated herein by
reference.

### IV.  <u>ITEMS TO BE SEIZED</u>

6.    The items to be seized are the evidence, fruits, and
instrumentalities of Conspiracy to Commit Mail Theft, in
violation of 18 U.S.C. § 1708 (Mail Theft) and 18 U.S.C. § 371

(Conspiracy) (the "Target Offenses"), as described in Attachment B, which is incorporated herein by reference.

## V.   <u>SUMMARY OF PROBABLE CAUSE</u>

7.   Beginning in January of 2023, I began investigating "back dock" mail thefts that were occurring in Los Angeles and Orange counties, within the Central District of California.  A back dock mail theft occurs when an individual enters the receiving area of a post office (the "back dock") and steals US Mail intended to be sent to a USPS processing plant.  From May 2023 to the current date, I have investigated nine separate incidents of back dock mail thefts occurring at the Fullerton Main Post Office ("Fullerton Main"), located at 1350 E. Chapman Avenue, Fullerton, California, 92834.  Based on my training and experience, I know that individuals who steal mail, including individuals who engage in back dock mail thefts, are usually looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value.  Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

8.   On January 23, 2024, at approximately 4:30 p.m., USPS employees of Fullerton Main contacted the Fullerton Police Department ("FPD") and informed the FPD of a robbery that had just occurred at the back dock of the Fullerton Main facility.

They reported that three individuals walked up to the Fullerton Main back dock and loaded US Mail into a white USPS tub before fleeing in a vehicle.

9.    USPS employees provided FPD a description of the individuals involved in the robbery and the vehicles they were driving (a Toyota Prius and a Black Nissan Sentra with tinted windows and no license plates).   The employees reported that the black Nissan Sentra had departed from Fullerton Main and headed westbound toward Wilshire Avenue.   At approximately 4:49 p.m., FPD located a black Nissan Sentra fitting the description provided[1] approximately 1.3 miles from Fullerton Main.   They conducted a traffic stop.   Because the windows were tinted, FPD Officers ordered that the driver (later identified as PIMENTEL) roll the windows down.   PIMENTEL did not immediately comply. Instead, the windows remained rolled up and the car began rocking from side to side.   FPD Officers again ordered that the windows be rolled down.   PIMENTEL then rolled down the windows. Eventually, PIMENTEL, BARRAGAN, and CORTEZ were ordered out of the car.   The car doors were left open.   FPD Officers then checked the car to make sure there were no additional occupants. In doing so, FPD Officers observed a white USPS tub containing US Mail in the names of people other than BARRAGAN, CORTEZ, or PIMENTEL.   The USPS tub was in plain view, positioned on the rear middle seat of the vehicle.

10.   The vehicle was then searched.   There was a USPS

---

[1] The car matched the description provided by the USPS employees in all respects except that it had a rear license plate.

Priority mail box in the front passenger area and various checks on the rear seat driver side floorboards.  In the trunk, FPD Officers found another USPS box, as well as a power drill and the front license plate of the vehicle.  They also noticed that the rear license plate appeared to have its screws not fully in.  FPD Officers then took BARRAGAN, CORTEZ, and PIMENTEL into custody and transported them to the Fullerton Jail.

## VI.   STATEMENT OF PROBABLE CAUSE

11.   Based upon my conversations and correspondence with other law enforcement officers, conversations with victims, review of FPD reports, review of surveillance footage from Fullerton Main, and participation in suspect interviews, I am aware of the following:

**A.   Back Dock Mail Theft of Fullerton Main on January 23, 2024**

a.   At approximately 5:03 p.m. on January 23, 2024, I was notified by Postal Management at Fullerton Main that a back dock mail theft had occurred at Fullerton Main.  I was also informed that, in the course of that incident, a USPS employee was injured.  Specifically, I was told that the suspects had hit the employee with their vehicle when fleeing the scene.  The employee sustained several abrasions but did not require medical attention.

**B.   Fullerton Main Post Office Surveillance Footage**

b.   After learning of the incident, I obtained and reviewed surveillance footage from Fullerton Main.  From my review of that surveillance footage, I observed a black Nissan Sentra with no license plate (the "Suspect Vehicle") enter the

Fullerton Main rear parking lot where the back dock entrance is located.  Another vehicle -- a Toyota Prius -- also entered the rear parking lot at about the same time.  An individual wearing a distinct jacket with the word "SECURITY" in white letters on the back (later identified as BARRAGAN from a review of FPD reports and my interview of BARRAGAN) entered the back dock of Fullerton Main with a white Postal Service tub already in his hands.  He was with two other unknown individuals.

       c.    After BARRAGAN and the two unknown individuals entered the back dock area, they approached a wire cage on the back dock containing outgoing US Mail.  BARRAGAN began to fill the tub he was holding with US Mail from the wire cage.  The two unknown individuals also appear to fill up another tub with US Mail.  Postal employees noticed BARRAGAN and the two unknown individuals loading the US Mail into the tubs and confronted them, causing them to flee the back dock with the tubs of US Mail.  The two unknown individuals then got into the Toyota Prius and fled.  BARRAGAN got into the Suspect Vehicle, which sped toward the exit of the Fullerton Main parking lot, where a USPS employee -- victim S.T. -- was standing.  The Suspect Vehicle then ran into S.T. and pushed S.T. onto the hood of the vehicle.  As the Suspect Vehicle continued to flee the Fullerton Main parking lot, S.T. clung onto the hood until the Suspect Vehicle turned westbound on Wilshire Avenue.  The force of the turn threw S.T. off the vehicle and into the street outside of the Fullerton Main rear parking lot.

**C.    Fullerton Police Department Response**

d.    Postal employees called 911 to report the
incident and provided a description of the Suspect Vehicle that
BARRAGAN fled in; specifically, a black Nissan with tinted
windows and no plates.  FPD Officers located a black Nissan
Sentra near the intersection of Raymond Ave and Orangethorpe
Ave, which is approximately 1.3 miles from Fullerton Main.  FPD
Officers noted the vehicle matched the description of the
Suspect Vehicle with the exception that this vehicle had a rear
license plate displayed.  Noting that the Suspect Vehicle was in
violation of California Vehicle Code Section 26708(a)(2)
(Illegal Window Tinting), FPD Officers conducted a traffic stop
of the vehicle.

e.    FPD Officers ordered the driver of the vehicle
(later identified as PIMENTEL) to roll down the windows.
PIMENTEL did not initially comply and FPD Officers noticed the
vehicle began rocking side to side for a few seconds.  FPD
Officers reissued the order to roll down the windows, at which
point PIMENTEL complied and the windows of the Suspect Vehicle
rolled down.  FPD Officers then ordered all the occupants to put
their hands out of the vehicle.  All three occupants complied.
Once additional officers arrived, BARRAGAN, CORTEZ, and PIMENTEL
were removed from the vehicle.  PIMENTEL got out of the driver's
seat, BARRAGAN had been sitting in the rear passenger's side
seat, and CORTEZ had been sitting in the rear driver's side
seat.  The doors of the Suspect Vehicle were left open.

f.    FPD Officers then approached the vehicle and

7

checked for additional occupants.  In doing so, FPD Officers noticed in plain view a white, plastic USPS tub in the rear middle seat containing hundreds of unopened pieces of US Mail. In the rear passenger's side door pocket, FPD Officers located a dark blue iPhone (SUBJECT DEVICE 3) along with two Prime credit cards in other people's names.  In the back pocket of the front passenger's seat, FPD Officers located a dark blue iPhone with a cracked screen and broken back (SUBJECT DEVICE 1).  FPD Officers also found a light blue iPhone 14 with a black case on CORTEZ's person (SUBJECT DEVICE 2).  FPD Officers also observed a large amount of checks in various names on the floorboard behind the driver's seat, as well as an additional box of unopened mail addressed to various individuals other than BARRAGAN, PIMENTEL, and CORTEZ in the trunk.  Also in the trunk, FPD Officers found a power drill, a license plate frame, and an additional license plate matching the one mounted on the Suspect Vehicle.  FPD Officers noted the screws holding the rear license plate were not fully in place.  Additional checks and unopened mail were located inside the center console.

g.   BARRAGAN, CORTEZ, and PIMENTEL were identified by their California Driver's License Identification Cards and arrested by FPD Officers for violating California Penal Code Section 211 (Robbery) and transported by FPD Officers to the Fullerton Jail, located at the FPD, at 237 W. Commonwealth Avenue Fullerton, California, 92832.

h.   Several FPD Officers conducted field show up/identification with victims and witnesses of the Fullerton

Main incident.  A field show up/identification entails bringing witnesses of the alleged crime to the location of the detained suspects and asking the witness to either positively or negatively identify the detained individual as the suspect they witnessed at the time of the alleged crime.  FPD Officers brought three witnesses to the field show up at separate times. During this identification process, BARRAGAN was positively identified by all three witnesses.  One of the three witnesses also positively identified CORTEZ and PIMENTEL, even though CORTEZ and PIMENTEL were not seen stealing mail from the back dock area on the Fullerton Main surveillance footage.  Two of the three witnesses did not identify CORTEZ or PIMENTEL as being present during the alleged crime.

**D.   Interview of S.T.**

i.   At approximately 8:10 pm on January 23, 2024, Postal Inspector Lauren Ireland interviewed victim S.T.  S.T. is a USPS employee at Fullerton Main.  S.T. was returning to Fullerton Main after completing the deliveries for the day and noticed three Hispanic men stealing US Mail on the back dock of Fullerton Main.  S.T. walked through the Fullerton Main parking lot and saw the Suspect Vehicle drive toward S.T.  S.T. noted that the driver of the Suspect Vehicle accelerated at a high rate of speed.  S.T. grabbed onto the hood of the vehicle in an attempt to not be hit by the Suspect Vehicle.  The Suspect Vehicle continued to accelerate as S.T. hung onto the hood. S.T. was dragged into the street before S.T. was able to let go. S.T. suffered several abrasions as a result but declined medical

attention.  After letting go, S.T. observed the Suspect Vehicle
travel westbound on Wilshire Avenue.  S.T. initially stated that
she believed the Suspect Vehicle was intending to hit her but
later stated that she did not believe the Suspect Vehicle was
trying to hit her.

**E.   Additional Investigation**

        j.   While speaking with Postal Inspector Loren Rofe
regarding the January 23, 2024 back dock mail theft incident at
Fullerton Main, he informed me of a similar incident which had
occurred at the Laguna Niguel Post Office located at 29911
Niguel Road, Laguna Niguel, California, 92607 ("Laguna Niguel")
on January 5, 2024.  In that incident, surveillance footage
shows two perpetrators stealing mail from the back dock at
Laguna Niguel.

        k.   I reviewed still photos from the surveillance
video of the two perpetrators from the back dock mail theft of
Laguna Niguel on January 5, 2024 (the "Laguna Niguel Incident").
Upon reviewing those photos, I determined that the perpetrators
of the Laguna Niguel incident were BARRAGAN and CORTEZ.  The
faces of the Laguna Niguel incident perpetrators were clearly
visible in the photos from that incident.  Based on a review of
those photos, it was apparent to me that those faces were the
same as those of BARRAGAN and CORTEZ, who I interviewed in
person after the Fullerton Main incident.  I also reviewed
photos of the vehicle used in the Laguna Niguel incident and saw
a dark colored Nissan Sentra with no license plate.  I compared
these photos with photos of the Suspect Vehicle from the

Fullerton Main incident and determined the vehicle used in both the January 5, 2024 Laguna Niguel incident and the January 23, 2024 Fullerton Main incident were the same.

**F. FPD Post-Arrest Interview of BARRAGAN**

l.   At approximately 8:03 p.m. on January 23, 2024, FPD detectives interviewed BARRAGAN in an interview room at the FPD.  Before questioning, FPD detectives read BARRAGAN his Miranda Rights.  BARRAGAN verbally stated that he understood each of his rights.  BARRAGAN confirmed that he had his cell phone with him at the time of his arrest.

m.   BARRAGAN confessed to grabbing packages from post offices and stated he had committed four previous back dock mail thefts.  BARRAGAN stated CORTEZ and PIMENTEL are his cousins, but denied that CORTEZ or PIMENTEL had accompanied him on any of the other back dock mail thefts.  BARRAGAN stated that a friend verbally explained to him how to steal packages from post offices, and that he started committing these thefts because he needed money.  BARRAGAN admitted to opening boxes after stealing them to see what the contents are, so he could  then sell whatever was inside on an application called "5miles," which he said he accessed from his iPad.  BARRAGAN stated he selected Fullerton Main for the January 23, 2024 back dock theft because it is located far away from where he lives.

n.   BARRAGAN described his phone as a midnight blue iPhone 15.  BARRAGAN also stated that, at the time of his arrest, his phone had fallen out of his pocket and ended up somewhere in the Suspect Vehicle.  FPD detectives asked BARRAGAN

if he would provide the passcode to his phone, and BARRAGAN
provided passcode "221983." FPD detectives asked if they could
look through his phone and BARRAGAN confirmed they could. FPD
detectives brought a dark blue iPhone into the interview room
(SUBJECT DEVICE 3). BARRAGAN confirmed the phone was his. FPD
detectives then entered the passcode BARRAGAN provided. That
passcode failed to unlock the phone. When FPD detectives again
inquired if BARRAGAN consented to a search of his phone,
BARRAGAN retracted his consent. BARRAGAN stated his phone was
registered to his cousin and not to himself.

## G.   USPIS Post-Arrest Interview of BARRAGAN

o.   At approximately 8:56 p.m. on January 23, 2024,
Inspector Loren Rofe and I interviewed BARRAGAN in an interview
room at the FPD. Before questioning BARRAGAN, Inspector Rofe
read BARRAGAN his Miranda Rights. BARRAGAN verbally stated that
he understood each of his rights and provided his signature on
USPIS Form 1067 Advice of Rights, further indicating that he
understood his rights and that he consented to the interview.

p.   During the interview, BARRAGAN explained he
presented the idea of stealing US Mail from the back docks of
post offices to his cousins, CORTEZ and PIMENTEL. BARRAGAN
stated that he had stolen from two other post offices but denied
knowing which post offices. When shown a picture of himself and
CORTEZ stealing from the Laguna Niguel Post Office, BARRAGAN
admitted he and CORTEZ had stolen US Mail from that post office.
BARRAGAN stated PIMENTEL drove the car for the Fullerton Main
incident but stated PIMENTEL was not the driver for the Laguna

Niguel incident.  BARRAGAN would not name the driver of the Laguna Niguel incident.

q.   BARRAGAN also confessed that he stole checks found in the mail he took during the January 5, 2024 Laguna Niguel incident.  BARRAGAN further confessed that he sold these stolen checks for $100 per check.  When asked who he sold the checks to, BARRAGAN stated he would contact his friend "Pollo," who would set up a meeting with one of his friends.  BARRAGAN would then sell the stolen checks to that friend.   When asked how he would contact "Pollo," BARRAGAN stated he would contact "Pollo" from his phone and that "Pollo's" phone number would be in his phone, but not as a saved contact.  BARRAGAN stated he was paid approximately $2,000 from the US Mail he stole from the Laguna Niguel incident.  BARRAGAN denied having a bank account or any knowledge of how to alter checks.

r.   BARRAGAN stated that the car used in both the Laguna Niguel incident and the Fullerton Main incident was borrowed from his cousin.  BARRAGAN stated his cousin was aware he was borrowing the car but was not aware they were using it to commit theft at US post offices.  BARRAGAN also admitted to removing the license plates from the car before each theft to prevent them from being identified.

## VII.   TRAINING AND EXPERIENCE ON TARGET OFFENSES AND DIGITAL DEVICES

12.   Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

a.   People who steal mail are often involved in fraud and identity theft crimes.  These individuals usually steal mail looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value.  Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

b.   It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card

14

accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; (6) verifying the status of stolen access devices; and (7) reselling stolen mail items on the internet or various applications that can be accessed via a digital device.

       c.   Oftentimes mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

       d.   It is also common for mail and identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

       e.   It is common for mail thieves, identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers and cellphones.

f.    Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

g.    Individuals engaged in mail and identity theft often use multiple digital devices.

13.   In this case, given the near-simultaneous arrival of the Toyota Prius and the Suspect Vehicle to the Fullerton Main back dock, together with the multiple occupants in both vehicles and CORTEZ's and BARRAGAN's prior involvement in the Laguna Niguel incident, there is additional reason to believe that digital devices were being used in preparation for, and during the commission of, the Target Offenses.  Further, BARRAGAN admitted to using an online application to resell stolen goods found in stolen packages, and also admitted that he sold stolen checks to a friend that he would contact using his cellphone.

## VIII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

14.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

15.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

17

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

16.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of

18

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

17.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BARRAGAN's, PIMENTEL's, and CORTEZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of BARRAGAN's, PIMENTEL's, and CORTEZ's faces with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

18.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX.   <u>CONCLUSION</u>

14.   For all the reasons described above, there is probable cause to believe that BARRAGAN, CORTEZ, and PIMENTEL committed Conspiracy to Commit Mail Theft, in violation of 18 U.S.C. § 1708 (Mail Theft) and 18 U.S.C. § 371 (Conspiracy).

15.   Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Target Offenses will be found on the SUBJECT DEVICES, as described in Attachment A.

//

//

//

//

/s/ Lucas Watanabe
_____
LUCAS WATANABE, United States
Postal Inspector


Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone
on this 30th day of January 2024.


_____
HONORABLE JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE